#24313-r-SLZ
**2008 SD 55**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

LLOYD ONE STAR et al.,                                              Plaintiffs and Appellees,
          v.
SISTERS OF ST. FRANCIS,
DENVER, COLORADO,                                              Defendant and Appellant,
          and
ST. FRANCIS MISSION, WISCONSIN
PROVINCE OF THE SOCIETY OF JESUS,
and DIOCESE OF RAPID CITY,                                    Defendants.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA
* * * *

HONORABLE A. P. FULLER
Judge

* * * *

GREGORY A. YATES of
Law Offices of Gregory A. Yates, PC
Rapid City, South Dakota

GREGORY A. YATES of
Law Offices of Gregory A. Yates, PC                          Attorneys for plaintiffs
Encino, California                                                      and appellees.

SHEILA S. WOODWARD and
MICHAEL F. MARLOW of
Johnson, Miner, Marlow, Woodward &
 Huff, Prof. LLC                                                       Attorneys for defendant
Yankton, South Dakota                                             and appellant.

* * * *

ARGUED OCTOBER 1, 2007
REASSIGNED APRIL 3, 2008

OPINION FILED **06/25/08**

#24313

ZINTER, Justice (on reassignment).

[¶1.]         Lloyd One Star and Marian Sorace brought this suit against a boarding school and various religious entities for physical and sexual abuse allegedly perpetrated by members of the entities who worked at the school. The suit was predicated on theories of breach of fiduciary duty, negligence, and vicarious liability. One entity, Sisters of St. Francis, Denver, Colorado (Sisters), moved for summary judgment on the statute of limitations. The circuit court denied the motion and we granted Sisters' petition for an intermediate appeal. We reverse.

I

[¶2.]         One Star attended the St. Francis Mission School on the Rosebud Indian Reservation from 1963 until 1970. Sorace, One Star's older sister, attended the school from 1960 until 1971. One Star and Sorace allege that during the course of their attendance they were subjected to sexual, physical, and emotional abuse by priests, brothers, and sisters who operated or worked at the school. For a number of years, One Star and Sorace remained silent about the abuse, claiming that at the time, they were threatened that if they disclosed it to anyone, they or their families would be humiliated, denied food, or otherwise harmed.

[¶3.]         In 2001, One Star responded to an advertisement in a newspaper seeking information on abuse suffered by former boarding students at the school. One Star's letter acknowledged the abuse and its effect upon him. In pertinent part, he wrote:

> I am a 44 year old man, and the boarding school experiences have been locked up inside me all these years. I know that what was done to me there affected me in a bad way during my whole life, especially in my relationship with my family members, then

> with my own sons, my wife, my general outlook in life, my relationship with Tunkasila, my self esteem, and the self-medicating during the years when only excessive use of alcohol eased the pain and inner turmoil.

The letter explained in detail the alleged acts of physical and sexual abuse perpetrated upon him and other students. He also identified the alleged perpetrators of the abuse. The letter concluded acknowledging the effects of the abuse:

> I am a Lakota man. Three years ago, the Rosebud Sioux Tribe had the bringing out ceremony, in which the chief's bonnet, which I inherited from my ancestors, was placed on my head. This is a big responsibility, and I can see how the long term effects of the sexual and physical abuse I endured in the early years of my life, and which I have described to you in this account, still have their affects on me personally, and on my interaction with the people. I'm glad about what you're doing, and I want to support you. You have my story now.

[¶4.] Sorace also realized the effects of the alleged abuse several years before filing suit. Sorace suffered from anger management issues throughout her life. In 1995, her boyfriend, Archie Beauvais, suggested that she see a counselor about her problems. She subsequently began counseling with Ron Oney. During counseling, Oney asked Sorace if she had been sexually abused, and Sorace informed him that she did not recall at that time. Shortly thereafter Sorace stopped the counseling sessions. Later that year, however, Sorace conversed with a girl who had been sexually abused. During this conversation, Sorace's memory of her abuse was revived. Sorace described the revival in her deposition:

> And as I was sitting there, I started to talk about me. And I said, you know what? I said, when I was little, I said, Brother Chapman – there was a brother at St. Francis Indian School – and I was telling her, it was coming out of me . . . . I said, this

is the first time I'm remembering something. And she goes, you were sexually abused? I said, yeah.

[¶5.] After informing Beauvais that she then recalled the abuse, Beauvais advised Sorace to call Ron Oney again and resume counseling for her anger problems. Sorace called Oney. She testified in her deposition that her subsequent conversations with Beauvais and Oney involved the following discussions of the abuse, its relationship to her problems, and her follow-up to treat those problems:

> Q: [Y]our answers to interrogatories that you gave us before said that in 1995 you told Ron [Oney] that you had been sexually abused.
>
> A: Okay. So then after I went to Ron [Oney] I did not go back to him and when – when [Beauvais] told me to go to counseling, that was about that time. . . . And so when I left I went to [Beauvais's] house and I told him, I said, guess what I remembered today? And he said, what, and he said – so I said – I didn't want to tell him. I didn't want to tell [Beauvais] because I lied to him and said – because he asked me one time about my anger and he said were you ever sexually abused when you were little, and I said no because I just – you know, I wanted to be with [Beauvais] and at that time I didn't remember anyway, but when I told him he said, remember when I was asking you and you told me no?
>
> I said, yes, because I didn't remember then but I do now. That's why I'm here telling you. And he said, well, the next thing you need to do is call Ron Oney[, the counselor,] in Rapid City and tell him.
>
> So I told Ron [Oney] and he said good. He said that's what – that's what – *that's what I was trying to get out of you, and I never went back to him.*
>  . . . .
> Q: So in [19]95, when you remembered, when you were talking to this young lady  . . .  and *you called Ron Oney and he said that's what I was trying to get at, that's what I was trying to figure out your anger and those things,* is that what he told you?
>
> A: *Uh-huh, and then I never went back to him,* and so three –three months later he calls [Beauvais] and asks – has asked [Beauvais] how I was doing. *And [Beauvais] said, well, you know, she's still an angry*

*woman. She's still an angry lady, and Ron [Oney] was trying to have him talk to me to go back to him, but I couldn't – I couldn't pay for the ninety bucks a session, you know.*

(Emphasis added.)

[¶6.]     Although neither One Star nor Sorace commenced this suit within three years of these events, on April 10, 2003, a class action entitled *Sherwyn Zephier, et al. v. United States of America*, United States Court of Federal Claims, Case No. 03-768, was filed on behalf of Native American children who were allegedly abused at Roman Catholic boarding schools. One Star was a named plaintiff in the action; Sorace was not. On November 1, 2004, the class action was dismissed for failure to exhaust administrative remedies.

[¶7.]     In June 2004, prior to dismissal of *Zephier*, One Star and Sorace filed this suit against the following entities: St. Francis Mission; Wisconsin Province for the Society of Jesus; Diocese of Rapid City; and Sisters. Although the complaint was filed in 2004, Sisters was not served with the summons until July 11, 2005.

[¶8.]     Following discovery, Sisters moved for summary judgment arguing that One Star and Sorace failed to file suit within the statute of limitations provided in SDCL 26-10-25. The circuit court denied the motion without opinion. This Court granted Sisters' petition for an intermediate appeal to consider the following issues:

> Whether One Star and Soraces' action was timely commenced under SDCL 26-10-25.
>
> Whether the statute of limitations was tolled by the class action filed against the United States.
>
> Whether the statute of limitations was tolled by fraudulent concealment.

> Whether the statute of limitations was tolled under the doctrine of estoppel by duress.

[¶9.] "Under our familiar standard of review in summary judgment cases, we decide only whether genuine issues of material fact exist and whether the law was correctly applied." Bordeaux v. Shannon County Sch., 2005 SD 117, ¶11, 707 NW2d 123, 126. This Court views the evidence most favorably to the non-moving party and the burden of proof is on the moving party to show that there are no genuine issues of material fact. Wulf v. Senst, 2003 SD 105, ¶17, 669 NW2d 135, 141. Although we often distinguish between the moving and nonmoving party in referring to the parties' summary judgment burdens, the more precise inquiry looks to who will carry the burden of proof on the claim or defense at trial. Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See* Celotex Corp. v. Catrett, 477 US 317, 322-23, 106 SCt 2548, 2552, 91 LEd2d 265, 273 (1986).[1]

II

[¶10.] SDCL 26-10-25 establishes the time in which a civil action arising out of childhood sexual abuse must be brought.

> Any civil action based on intentional conduct brought by any person for recovery of damages for injury suffered as

---

1. We recognized this distinction in *Bordeaux*, stating, "those resisting summary judgment must show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof." *Bordeaux*, 2005 SD 117, ¶14, 707 NW2d at 127 (quoting Chem-Age Indus., Inc. v. Glover, 2002 SD 122, ¶18, 652 NW2d 756, 765 (citation omitted)).

a result of childhood sexual abuse shall be commenced within three years of the act alleged to have caused the injury or condition, or three years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by the act, whichever period expires later.

[¶11.] In this case there is no dispute that although the acts of abuse occurred decades ago, One Star and Sorace became aware of the abuse more than three years before filing suit. They argue, however, that their claims did not accrue until 2002, because they claim that until that time they had not discovered the connection between the abuse and the effect that it had on them. Sisters respond that One Star's letter and Sorace's deposition reflect that each of them was aware of the causal relationship between the abuse and its effect on them for more than three years before they filed suit. Therefore, Sisters contend that it presumptively established that Plaintiffs commenced their suit outside the statute of limitations. Sisters further contend that having made a presumptive showing that the suit was untimely, One Star and Sorace failed to satisfy their responsive burden of identifying any facts creating a material issue of entitlement to an exception to the statute of limitations. We agree with Sisters.

[¶12.] In considering summary judgment on a statute of limitations defense, the burden of production shifts:

When faced with "'a summary judgment motion where the defendant asserts the statute of limitations as a bar to the action and presumptively establishes the defense by showing the case was brought beyond the statutory period, the burden shifts to the plaintiff to establish the existence of material facts in avoidance of the statute of limitations[.]'" . . . Generally, a statute of limitations question is left for the jury; however, "'[d]eciding what constitutes accrual of a cause of action'" is a question of law and reviewed de novo. In reviewing under this

standard, "[w]e give no deference to the trial court's conclusions of law."

Peterson v. Hohm, 2000 SD 27, ¶¶7-8, 607 NW2d 8, 10-11 (citations omitted). *See also* Conway v. Conway, 487 NW2d 21, 23 (SD 1992). Thus, we must first determine what constitutes accrual of a cause of action under SDCL 26-10-25. Then, we must determine whether the parties satisfied their respective summary judgment burdens on this defense.

[¶13.]    With respect to accrual, there is no dispute that both Plaintiffs discovered the alleged abuse more than three years before filing suit. SDCL 26-10-25, however, may delay the accrual until a plaintiff reasonably should have discovered the causal connection between the alleged abuse and the plaintiff's injury. Therefore, we agree with One Star and Sorace that, under this statute, discovery of the injuries alone is not sufficient to start the running of the statute. Rather, there must also be discovery of some tie linking the acts of abuse to an injury; i.e., "that the injury or condition was caused by the act." SDCL 26-10-25.

[¶14.]    In *Stratmeyer v. Stratmeyer*, 1997 SD 97, 567 NW2d 220, in the course of discussing the retroactivity of SDCL 26-10-25, we cited *Hammer v. Hammer*, 418 NW2d 23 (WisCtApp 1987), which discussed when a cause of action for childhood sex abuse accrues at common law:

> Sexual abuse at an early age prompts involuntary coping mechanisms which may prevent victims from making the causal connection between the abuse they suffered as children and the psychological problems they experience as adults.
>
> > [A] cause of action does not necessarily accrue when the first manifestations of injury occur. The claimant has leeway to not start an action until she

> knows more about the injury and its probable
> cause.
>
> The policy justification for applying the statute of
> limitations to protect defendants from the threat of
> liability for deeds in the past is unpersuasive in
> incestuous abuse cases. . . .  Further, the injustice of
> barring meritorious claims before the claimant knows of
> the injury outweighs the threat of stale or fraudulent
> actions.

*Stratmeyer*, 1997 SD 97, ¶19, 567 NW2d at 224 (quoting *Hammer*, 418 NW2d at 27).

[¶15.] One Star and Sorace contend that under *Stratmeyer-Hammer,* their causes of action did not accrue until they were fully aware of all of their injuries.  It should be noted, however, that the issue in *Stratmeyer* was limited to whether SDCL 26-10-25 should be applied retroactively, and *Stratmeyer* did not determine when a cause of action accrues under SDCL 26-10-25.  More importantly, the *Hammer* rule, as clarified by the Wisconsin Supreme Court, specifically rejects One Star and Sorace's full extent of the injuries argument.  In *Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis2d 302, 533 NW2d 780 (1995), the Wisconsin Supreme Court clarified *Hammer*, holding that under this type of childhood sex abuse discovery rule, a plaintiff may not delay commencement of an action until the full extent of the injury is known.  Rather, a discovery statute of limitations accrues as soon as a plaintiff obtains sufficient evidence that a wrong has indeed been committed by an identified person.  *Id.* at 320-21, 533 NW2d at 787.

[¶16.] This Court has also rejected Plaintiffs' "full extent of the injuries" argument under a discovery statute of limitations.  In *Strassburg v. Citizens State Bank*, 1998 SD 72, 581 NW2d 510, we considered the time of accrual under a discovery statute (SDCL 15-2-13) in a situation where a plaintiff accused a bank of

conversion in connection with the bank's setoff against the plaintiff's account. In 1985, the bank admitted it had setoff funds, but not the amount plaintiff claimed. Despite knowledge of the 1985 setoff, the plaintiff did not sue the bank until a decade later, when he received information that the bank may have setoff a larger amount. In addressing accrual under discovery statutes, this Court noted that "[a] statute of limitations ordinarily begins to run when the plaintiff either has actual notice of a cause of action or is charged with notice." *Id.* ¶10, 581 NW2d at 514. Elaborating on being charged with notice, we stated, "[c]onstructive notice is notice imputed by the law to a person not having actual notice." *Id.* (citing SDCL 17-1-3). We explained, "[o]ne having actual notice of circumstances sufficient to put a prudent person on inquiry about 'a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself.'" *Id.* (citing SDCL 17-1-4). Therefore, we specifically stated: "Limitations periods will not abide indefinitely while those aggrieved discover all their damages." *Id.* ¶11, 581 NW2d at 515. Instead, "[s]tatutes of limitations begin to [accrue] when plaintiffs first become aware of facts prompting a reasonably prudent person to seek information about the problem and its cause." *Id.* ¶13, 581 NW2d at 515.[2]

[¶17.]    These rules of accrual apply in childhood sex abuse cases involving statutes that delay the running of the statute until such time as a reasonable person should have discovered a causal connection between the abuse and the injury. In *Frideres v. Schiltz*, 113 F3d 897 (8thCir 1997), the plaintiff had some

---

2.    Relying in part on *Woodroffe v. Hasenclever*, 540 NW2d 45, 48 (Iowa 1995), another childhood sexual abuse case.

memories of her childhood abuse, the last incident occurring in 1967. In 1982, she sought help from her family physician for depression, at which time the physician recommended that the plaintiff seek further professional help or try an antidepressant drug. In 1988, the plaintiff visited with her priest who also encouraged her to seek professional help for the difficulties she was experiencing as a result of the abuse. The plaintiff did not file suit until 1991. The court applied the same discovery rule, which allowed that plaintiff to bring suit within a prescribed period from the discovery of the connection between the abuse and the injuries. The Eighth Circuit concluded that given that plaintiff's knowledge of her prior sexual abuse, and in light of her conversations with the priest and physician, she "had enough knowledge linking the abuse and the resultant injuries . . . to put her on inquiry notice" of her cause of action. *Id.* at 899. The *Frideres* court explained:

> We agree with Frideres that mere knowledge of abuse will not necessarily start the running of the limitations period in every case. In this case, however, Frideres had enough knowledge linking the abuse and the resultant injuries, as evidenced by her visits to her family physician and priest in search of advice, to put her on inquiry notice more than two years prior to the commencement of this action. As the Supreme Court of Iowa stated, "'the statute of limitations begins to run when a plaintiff first becomes aware of facts that would prompt a reasonably prudent person to begin seeking information as to the problem and its cause.'" At that time, a person is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation. Because Frideres remembered the abuse and was aware of enough of its effects to seek help more than two years prior to the commencement of her action, her action is time barred.

*Id.* (citations omitted).

[¶18.]    Thus, a plaintiff under SDCL 26-10-25 need not be fully aware of all his or her injuries before the statute of limitations accrues. *Id.*; *Strassburg*, 1998 SD 72, ¶11, 581 NW2d at 515. *See also* Woodroffe v. Hasenclever, 540 NW2d 45, 46-49 (Iowa 1995). Rather, the statute accrues and the plaintiff is put on inquiry notice when facts come to light that would prompt a reasonably prudent person to seek out information regarding his or her injury or condition and its cause. *See Strassburg, Frideres,* and *Woodroffe, supra.* Therefore, our remaining questions are whether, under summary judgment standards, Sisters made its presumptive showing that Plaintiffs were on inquiry notice of their injuries more than three years prior to July 11, 2005; and if so, whether Plaintiffs satisfied their responsive burden of identifying facts creating a material issue of dispute concerning their failure to file suit within those three years.

[¶19.]    With respect to One Star, Sisters presumptively established that One Star was on inquiry notice of the relationship between his condition and its cause when he responded to the newspaper advertisement in May of 2001. At that time, One Star wrote: "I know that what was done to me there affected me in a bad way during my whole life, especially in my relationship with my family members, then with my own sons, my wife, my general outlook in life, my relationship with Tunkasila, my self esteem. . . ." This response, together with the rest of his letter to the newspaper, presumptively established that he was on actual notice of the effects that the sexual abuse had on him by May of 2001.

[¶20.]    Although the original complaint was filed in 2004, the suit against Sisters was not commenced until the summons was served on July 11, 2005. SDCL

15-2-30. Because One Star did not commence this suit until more than three years after he had actual knowledge of the causal connection, Sisters presumptively established that his action was commenced outside the time limits prescribed by SDCL 26-10-25.

[¶21.]     Sisters also presumptively established that Sorace commenced her case more than three years after she was on actual or inquiry notice that her injuries were caused by the abuse. Concededly, before 1995, Sorace claimed her recollection of the abuse was repressed. Therefore, we may assume that at that time Sorace was unaware her anger management problems were caused by the abuse. Sisters, however, presumptively established that later in 1995: Sorace's recollection of the abuse revived; both Beauvais and Sorace's mental health counselor (Oney) thought that her anger issues were connected to the sexual abuse; Oney specifically advised her of this latter fact; and, like the plaintiff in *Frideres*, Sorace was encouraged to seek professional help to treat those injuries but she failed to do so. Therefore, Sorace possessed actual knowledge of a causal connection to her anger management problem in 1995. That discovery put her on inquiry notice to seek information about the problem and its cause. *Strassburg*, ¶13, 581 NW2d at 515. There is, however, no dispute that Sorace did not commence her suit until more than three years following this notice. Therefore, Sisters met their initial burden of presumptively showing that the case was brought beyond the statutory period.

[¶22.]     Because Sisters satisfied its burden of making a presumptive showing, the burden shifted to One Star and Sorace to identify specific facts demonstrating

that their claims fell within an exception; i.e., disputing that they were on actual or inquiry notice in 2001 and 1995, respectively. The responsive affidavits of One Star and Sorace, however, contained nothing but undated statements indicating their ages at the time of the alleged abuse and the virtually identical boilerplate averments that the majority of seventy-two plaintiffs submitted in resisting summary judgment in *Zephier v. Catholic Diocese of Sioux Falls*, 2008 SD 56, ¶3 n2, ___ NW2d ___. Rather than providing facts disputing inquiry notice or identifying conflicting facts of the time and place when they allege they discovered the causal connection, like all of the plaintiffs in both cases, One Star and Sorace simply submitted identical affidavits generally asserting: "[s]ince I have been involved in this lawsuit I have had discussion with other victims of the abuse. As a result many memories have been revived and some abuse events recalled for the first time by me and I am now for the first time aware of the many altering affects that the abuse has had on me." And, like all of the plaintiffs in both cases, One Star and Sorace declared that "specifics surrounding the abuse will be set forth in more detail in my deposition, when it is taken in this case or when I testify at trial in this case."

[¶23.]        These types of general statements are insufficient to rebut a properly supported motion for summary judgment under SDCL 15-6-56(e). That statute requires that "[w]hen a motion for summary judgment is made and supported as provided in § 15-6-56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in § 15-6-56, must set forth specific facts showing that there is a genuine issue for trial."

SDCL 15-6-56(e) (emphasis added). In *Bordeaux v. Shannon County Schools,* we emphasized this requirement:

> We require "those resisting summary judgment [to] show that they will be able to place sufficient evidence in the record at trial to support findings on all the elements on which they have the burden of proof." In fact, "SDCL 15-6-56(e) requires the opposing party to be diligent in resisting a motion for summary judgment, and *mere general allegations* and denials which do not set forth specific facts will not prevent the issuance of a judgment."

2005 SD 117, ¶14, 707 NW2d at 127 (emphasis added) (citations omitted). *See also* Baatz v. Arrow Bar, 452 NW2d 138, 140 (SD 1990) (stating: "Mere allegations that are devoid of specific facts will not prevent the issuance of summary judgment."); Casazza v. State, 2000 SD 120, ¶16, 616 NW2d 872, 876 (noting, "[u]nder SDCL 15-6-56(e), the opposing party [must] be diligent in resisting a motion for summary judgment, and mere general allegations and denials which do not set forth specific facts will not prevent the issuance of a judgment"); U.S. Bank Nat'l Ass'n v. Scott, 2003 SD 149, ¶24, 673 NW2d 646, 653 (same).

[¶24.] Sorace provided the only other responsive evidence: an affidavit from psychologist James Snow, who diagnosed chronic post-traumatic stress disorder in 2006. He opined that Sorace was not emotionally/psychologically equipped to discover "that condition" before he diagnosed it. Sorace contends her late discovery of this new condition made her suit timely. Although we treat Snow's factual averments as true for purposes of summary judgment, the discovery of new injuries does not create a *material* issue of disputed fact because discovery of this "new injury" is irrelevant under the discovery/inquiry notice statute of limitations.

[¶25.]	Snow's 2006 diagnosis is irrelevant because after being put on inquiry notice of the abuse and some of the resultant injuries in 1995, Sorace's cause of action accrued, the statute began to run, and Sorace had three years to investigate and file suit. Having failed to file suit within those three years, the subsequent discovery of new injuries or the subsequent revival of past abuse did not, as a matter of law, revive the cause of action. As we specifically noted in *Strassburg,* a discovery/inquiry notice statute is not tolled as to a plaintiff who discovers the wrongful act and some of the resultant injuries but later claims discovery of additional injuries. 1998 SD 72, ¶11, 581 NW2d at 515. "Limitations periods will not abide indefinitely while those aggrieved discover all their damages." *Id.* Ultimately, "[o]ne having actual notice of circumstances sufficient to put a prudent person on inquiry about a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself." *Id.* ¶10, 581 NW2d at 515. As the Iowa Supreme Court explained in similar sex abuse cases:

> [O]nce a person is aware a problem exists, [she] has a duty to investigate even though [she] may not have exact knowledge of the nature of the problem that caused the injury.
> . . .
> [T]he duty to investigate does not depend on exact knowledge of the nature of the problem that caused the injury. It is sufficient that the person be aware that a problem existed. One purpose of inquiry is to ascertain its exact nature.
>
> . . .
>
> [And therefore, t]he question in any given case is not, What did plaintiff know of the injury done [to her]? but, What might [s]he have known, by the use of the means of information within [her] reach, with the vigilance which the law requires of [her]?

*Woodroffe*, 540 NW2d at 48-49.

[¶26.]     In this case there is no dispute that Sorace became aware of both the abuse and some of the causally related injuries in 1995. That discovery prompted a duty to seek information about the problem and its cause, and to file suit within three years. Sorace, however, failed to do so. Sorace also failed to raise a specific issue of material fact disputing her 1995 discovery of the abuse and some of the injury caused by that abuse. She finally failed to identify any fact suggesting that a reasonably prudent person would not have pursued the matter through investigation and suit during those three years.[3] Therefore, her discovery of new alleged injuries eight years after her cause of action accrued did not create a material issue of disputed fact precluding summary judgment.

[¶27.]     We conclude that Sisters made its presumptive showing that Plaintiffs' suit was filed beyond the statute of limitations. We also conclude that Plaintiffs failed to set forth specific facts in their responsive affidavits creating a material issue of disputed fact concerning Sisters' showing. Therefore, the circuit court incorrectly denied summary judgment under SDCL 26-10-25.

---

3.     This is not a case in which Sorace filed a responsive affidavit suggesting that a reasonably prudent person would not have pursued the matter or would not have discovered a causal connection within three years of the 1995 discovery of the abuse and injury. Had such an affidavit been filed, a material issue of disputed fact may have been created; i.e., would a reasonably prudent person have misunderstood the causal connection and been justified in failing to pursue the matter under the inquiry notice duty? In this case, however, Sorace made no such showing and therefore the statute began to run at the time of the 1995 discoveries.

III

[¶28.]    One Star and Sorace contend that the filing of the federal *Zephier* class action tolled the statute of limitations for these subsequent state claims. The United States Supreme Court has held that a class action tolls a statute of limitations asserted against class and non-class member plaintiffs until the class certification issue is resolved. "[C]ommencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Am. Pipe & Constr. Co. v. Utah, 414 US 538, 554, 94 SCt 756, 766, 38 LEd2d 713 (1974). *See also* Crown, Cork & Seal Co., Inc. v. Parker, 462 US 345, 354, 103 SCt 2392, 2397-98, 76 LEd2d 628 (1983) (stating: "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied."). Unnamed class members may also be protected by this rule. Devlin v. Scardelletti**,** 536 US 1, 10, 122 SCt 2005, 2010, 153 LEd2d 27 (2002). The theory of class action tolling is two-fold: the class action provides notice to the defendant of the potential claim, and tolling promotes judicial efficiency by relieving individual class members from their obligation to file separate lawsuits in the fear that the class action will later be dismissed after the statutory period has expired. *See Am. Pipe*, 414 US at 553-54, 94 SCt at 766, 38 LEd2d 713.

[¶29.]    Considering these purposes, the doctrine of class action tolling is not without limits. In the case before us now, Sisters was not a named defendant in the *Zephier* class action, and therefore tolling would not promote the purpose of providing notice to Sisters of this claim. Consequently, class action tolling does not

apply when the defendant is not named in the class action. *See* Boone v. Citigroup, Inc., 416 F3d 382, 392 (5thCir 2005) (holding that because none of the current defendants were named as defendants in the prior class action, it was "facially obvious" that the pendency of the class action could not toll limitations as to any of them). *See also* Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp. 413 F3d 553, 568 (6thCir 2005); Wade v. Danek Med., Inc., 5 FSupp2d 379, 383 n4 (EDVa 1998); Columbus Bd. of Educ.. v. Armstrong World Indus., Inc., 627 NE2d 1033, 1040 (OhioCtApp 1993).

[¶30.]    Although Sisters was not a defendant in *Zephier,* Plaintiffs argue that class action tolling nevertheless applies because Sisters was acting as the alter ego of the named defendant in *Zephier.* Plaintiffs contend that the *Zephier* suit complained of the United States' management and control of Indian boarding schools, and therefore Sisters was effectively on notice of a claim alleging sexual and physical abuse. Plaintiffs' contention, however, fails to show how Sisters could be considered the alter ego of the United States. They have also failed to demonstrate how allegations of wrongdoing by United States in a different jurisdiction,[4] involving different parties and claims[5] provided notice to Sisters of Plaintiffs' current claim.

---

4.    Many courts hold that class action cross-jurisdictional tolling does not apply. *See, e.g.,* Portwood v. Ford Motor Co*.,* 701 NE2d 1102, 1105 (Ill 1998); Ravitch v. Pricewaterhouse, 793 A2d 939, 941-43 (PaSuperCt 2002); Maestas v. Sofamor Danek Group*,* Inc., 33 SW3d 805, 808-09 (Tenn 2000). *See generally* Thelen v. Massachusetts Mut. Life Ins. Co*.,* 111 FSupp2d 688, 694 (DMd 2000) (providing that under the facts of the case, cross-jurisdictional tolling did not apply). Although other jurisdictions allow class action cross-jurisdictional tolling, we did not permit cross-jurisdictional tolling on the one

(continued . . .)

[¶31.]     Because Plaintiffs have failed to cite any authority supporting class action tolling in cases involving different defendants, different claims, in different jurisdictions, this Court declines to adopt Plaintiffs' theory of cross-jurisdictional tolling during the *Zephier* class action litigation.

IV

[¶32.]     One Star and Sorace argue that Sisters intentionally and fraudulently concealed the abuse in an attempt to minimize Sisters' liability.  Fraudulent concealment is an implied exception to the statute of limitations.  When applicable, the exception tolls the statute of limitations until the cause of action is discovered or might have been discovered by the exercise of diligence.  Hinkle v. Hargens*, 76 SD 520, 524-25, 81 NW2d 888, 890-91 (1957).  If a trust or confidential relationship exists, an affirmative duty to disclose is imposed, and mere silence by the party under that duty constitutes fraudulent concealment.  Glad v. Gunderson, Farrar, Aldrich & DeMersseman, 378 NW2d 680, 682-83 (SD 1985).  The silence must

---

(. . . continued)

occasion we considered it.  Peterson v. Hohm, 2000 SD 27, ¶¶16-18, 607 NW2d 8, 13 (rejecting a claim that the filing of an action in a federal court without diversity jurisdiction tolled the state statute of limitations in a subsequent state case).

5.     The claims asserted in *Zephier* involved allegations of breach of treaty and breach of trust by the United States. The claims asserted in this case alleged that Sisters were negligent and were vicariously liable for their members' acts and omissions.  At least one court has concluded that different claims precludes class action tolling.  *See* Butler v. Deutsche Morgan Grenfell, Inc., 140 P3d 532 (NMCtApp 2006) (concluding  that because defendants had not been named in underlying class action, and because many of plaintiff's claims differed substantially from those asserted by the class plaintiffs, the defendants were not adequately on notice to permit class action tolling).

concern defects which the party with the duty to disclose knew or should have known. Holy Cross Parish v. Huether, 308 NW2d 575, 577 (SD 1981).

[¶33.] Plaintiffs assert that trust or confidential relationship tolling applies under *Koenig v. Lambert,* 527 NW2d 903 (SD 1995) (overruled on other grounds by *Stratmeyer*, 1997 SD 97, 567 NW2d 220). In *Koenig*, an altar boy was sexually abused by his priest from 1958 to 1975. It was not until 1991, through therapy, that the plaintiff began to realize that he had been the victim of abuse. In 1992, the plaintiff sued the priest and the Diocese. In concluding that summary judgment was incorrectly granted in favor of the Diocese, this Court noted that "if there existed a trust or confidential relationship between the Diocese and Koenig then silence on the part of the Diocese [was] sufficient for this Court to find that the Diocese fraudulently concealed the cause of action from Koenig, thereby tolling the statute of limitations." *Id.* at 906. In determining that a fiduciary relationship existed, we further noted that the "Diocese and its members were not only acting as members of the church, they were also acting as agents or representatives of God," and that the plaintiff "put his trust and faith in the members of the Diocese, and was encouraged to do so by the Diocese." *Id.*

[¶34.] Like the plaintiff in *Koenig*, One Star and Sorace contend they put their trust in Sisters while attending St. Francis, and therefore, the cause of action was fraudulently concealed until such time as Sisters affirmatively disclosed it to them. One Star and Sorace fail, however, to recognize that fraudulent concealment only tolls the statute of limitations "until the cause of action is discovered or might have been discovered by the exercise of diligence." *Hinkle*, 76 SD at 524, 81 NW2d

at 890. Thus, fraudulent concealment does not apply, even where a confidential relationship exists, if the plaintiff obtains "knowledge of the basic operative facts." *Glad*, 378 NW2d at 683. Here, both One Star and Sorace were aware of the abuse and injury (One Star by May of 2001 and Sorace by 1995), as well as the identity of the abusers, for more than three years prior to bringing suit against Sisters. Under these circumstances, fraudulent concealment does not apply. *Id. See also* Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F3d 409, 427 (2dCir 1999) (concluding that tolling for fraudulent concealment "operates for the benefit of those—and we think *only* those—who are not aware of the facts that have been concealed"); Mark K. v. Roman Catholic Archbishop of Los Angeles, 79 CalRptr2d 73 (CalCtApp 1998) (finding no estoppel by concealment because plaintiff was aware of his injury, the priest's identity and the priest's connection with the church); Doe v. Archdiocese of Washington, 689 A2d 634 (MdCtSpecApp 1997) (concluding that statute of limitations was not tolled by fraudulent concealment doctrine where plaintiff did not allege any acts subsequent to the abuse that prevented him from being aware of his claims); Zumpano v. Quinn, 6 NY3d 666, 849 NE2d 926, 930 (2006) (concluding that tolling was inapplicable where plaintiffs "possessed timely knowledge of the actual misconduct and the relationship between the priests and their respective dioceses to make inquiry and ascertain relevant facts prior to the running of the statute of limitations"); Doe v. Archdiocese of Cincinnati, 849 NE2d 268, 279 (2006) (finding no fraudulent concealment where plaintiff "had all of the facts necessary to investigate and prosecute his potential causes of action against the archdiocese"); Baselice v. Franciscan Friars Assumption

BVM Province, Inc., 879 A2d 270 (PaSuperCt 2005) (finding no tolling where defendants never concealed the fact of the injury itself, the identity of the abuser, or the abuser's place within the Archdiocese).

[¶35.]     Here, both One Star and Sorace not only had actual knowledge of the basic operative facts necessary to file this suit for more than three years before they commenced it, they had actual notice of substantial injury caused by that abuse and they were on inquiry notice of any further claimed injuries.  Furthermore, they have not suggested that Sisters even knew of their resultant injuries.  Therefore, Sisters could not, as a matter of law, have fraudulently concealed something that One Star and Sorace had either already discovered or something that they alone knew.  A California Court of Appeals explained the consequences of a contrary rule:

> The wrongful conduct alleged against the church was its inaction in the face of the accusations against Father Llanos. Thus, what the church failed to disclose was merely evidence that the wrong had been committed.  If plaintiff's approach were to prevail, then any time a tortfeasor failed to disclose evidence that would demonstrate its liability in tort, the statute of limitations would be tolled under the doctrine of concealment. Regardless of whether the issue is characterized as fraud by concealment or equitable estoppel, this is not the law.

*Mark K.,* 67 CalApp4th at 613.  Because One Star and Sorace had actual notice of the operative facts allegedly concealed, the doctrine of fraudulent concealment did not toll the statute of limitations.

V

[¶36.]     Plaintiffs finally assert tolling of the statute of limitations under the equitable theory of estoppel by duress.  They acknowledge that South Dakota has not recognized this exception to the statute of limitations.  For purposes of this case,

however, we may assume without deciding that the exception exists because Plaintiffs did not make the summary judgment showing necessary to establish entitlement to the exception.

[¶37.] Where it has been adopted, the exception generally requires a showing that the duress be continuous. *See* Overall v. Estate of Klotz, 52 F3d 398, 404, (2dCir 1995) (noting that a plaintiff must "demonstrate some threats or abuse during the limitations period" for duress tolling to be appropriate). *See also* Rakes v. United States, 442 F3d 7, 26 (1stCir 2006) (requiring plaintiff to demonstrate that duress was continuous before tolling available); Murphy v. Merzbacher, 697 A2d 861, 869-70 (MD 1997) (rejecting claim of duress because there was "absolutely no evidence" that the defendant made any threats to the victims or engaged in any overt acts towards them for over twenty years prior to the commencement of the litigation).[6]

[¶38.] In this case, Plaintiffs identify no facts suggesting that the alleged duress continued from the time they were students until they filed this suit. They do not allege, either in their complaint or affidavits, that any threats continued during the forty years after they left St. Francis. Consequently, even if we recognized the exception, Plaintiffs did not make their responsive showing necessary to satisfy this exception to the statute of limitations.

---

6. Other cases that have recognized some form of the exception include *Bank of Penfield v. Colclough*, 154 Ga 222, 114 SE 33 (1922) and *Ateeq v. Najor*, 15CalApp4th 1351, 19 CalRptr2nd 320 (CalCtApp 1993).

VI

[¶39.]     We conclude that One Star and Sorace failed to commence this action within three years of their discovery of the abuse and their injuries.  Furthermore, class action tolling, fraudulent concealment, and equitable estoppel did not toll the statute as a matter of law or fact.  The circuit court's order denying Sisters' motion for summary judgment is reversed.

[¶40.]     GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, concur.

[¶41.]     JOHNSON, Circuit Judge, concurs in part and dissents in part.

[¶42.]     JOHNSON, Circuit Judge, sitting for SABERS, Justice, disqualified.

JOHNSON, Circuit Judge (concurring in part and dissenting in part).

[¶43.]     I concur with the majority's holding that, with respect to One Star, the circuit court should have granted Sisters' motion for summary judgment.  As the majority correctly notes, One Star's response to the newspaper advertisement presumptively established that by May of 2001 he was on inquiry notice of the causal connection between the acts of abuse at the St. Francis Mission School and his current condition.  Armed with this knowledge, and pursuant to SDCL 26-10-25, One Star had a three-year period in which to commence a lawsuit against Sisters. His failure to commence suit within that time period renders summary judgment appropriate.

[¶44.]     I disagree with the Court's similar finding as to Sorace.  Contrary to the majority's assertion, Sisters has not met its burden of presumptively

establishing that "Sorace commenced her case more than three years after she was on actual and inquiry notice that her injuries were caused by the abuse." *Supra* ¶21.

[¶45.] In attempting to make this showing, Sisters relies exclusively on Sorace's deposition testimony. The gist of this testimony provides:

> Q: So in [19]95, when you remembered, when you were talking to this young lady . . . and you called Ron Oney and he said that's what I was trying to get at, that's what I was trying to figure out your anger and those things, is that what he told you?

> A: Uh-huh, and then I never went back to him, and so three - three months later he calls [Beauvais] and asks - has asked [Beauvais] how I was doing. And [Beauvais] said, well, you know, she's still an angry woman. She's still an angry lady, and Ron [Oney] was trying to have him talk to me to go back to him, but I couldn't - I couldn't pay for the ninety bucks a session.

It is true that Oney, a mental health professional, and Beauvais, a friend of Sorace and the holder of a doctorate in an unspecified field, may have made the connection between Sorace's anger issues and the sexual abuse she endured many years before. The determinative question, however, is not whether a trained professional could make the causal connection. Rather, the statute of limitations begins to run "when facts come to light that would prompt a *reasonably prudent person* to seek out information regarding his or her injury or condition and its cause." *Supra* ¶18 (emphasis added).

[¶46.] Oney's "specific advisement" to Sorace of the causal relationship between her problems and the abuse was ambiguous at best, and at worst, provided no notice at all. Sorace's deposition testimony established little more than the fact

that her recollection of abuse was something Oney deemed important in his counseling sessions with Sorace when trying to diagnose her problems with anger. This, however, does not equate to a general finding that Sorace or a reasonably prudent person in her position would have made the connection between the acts of abuse and her current condition, and cannot as a matter of law be said to have afforded Sorace the type of notice she was owed under SDCL 26-10-25.

[¶47.]    In its effort to show that Sorace was on both actual and inquiry notice in 1995, the majority analogizes to the *Frideres* case. The facts of *Frideres* are materially distinguishable from those presently before the Court. Frideres had always retained some memory of her abuse. Sorace, on the other hand, had repressed her boarding school memories for quite some time. Only after beginning counseling sessions and talking with another girl who had been sexually abused was Sorace able to recall her abuse.

[¶48.]    More importantly, Frideres had previously consulted with other professionals regarding her abuse and symptoms of depression, and had received specific advice from these professionals associating the abuse and her current condition. As early as 1982 - eight years before speaking with a clinical psychologist - she had sought help from her family physician for feelings of depression. Her doctor recommended that she seek further professional help or try an antidepressant drug. In 1988 she had spoken with her priest about the abuse. The priest specifically advised her to "seek professional help for the difficulties she was experiencing *as a result of the abuse*." *Frideres*, 113 F3d at 898 (emphasis added). Thus, Frideres had been clearly informed of the cause of her problems at least

several years prior to filing suit. In contrast, Sorace had minimal contact with any medical, psychological, or clerical professionals prior to her treatment with Dr. Snow. It is true that Sorace had gone to counseling with Ron Oney in 1995, but she did not discuss her abuse with him at that time, because she could not remember it. Sorace's memories of abuse came back later in 1995, but her only subsequent contact with Oney was a phone call. After telling Oney that she had indeed been sexually abused as a child, he vaguely suggested that "that's what I was trying to get out of you." Oney's advice lacked the clarity present in *Frideres* and would not "prompt a reasonably prudent person to seek out information regarding his or her injury or condition and its cause." *Supra* ¶18.

[¶49.] Even if Sorace's deposition testimony was sufficient to presumptively establish actual or inquiry notice, I disagree with the majority's holding that Sorace has "failed to raise a specific issue of material fact disputing her 1995 discovery of the abuse and some of the injury caused by that abuse." *Supra* ¶26. Dr. Snow's affidavit does exactly that.

[¶50.] In his affidavit, Dr. Snow diagnoses Sorace's condition as Chronic Posttraumatic Stress Disorder and states that Sorace "was not emotionally and/or psychologically equipped to recognize that condition as being related to the sexual abuse trauma[.]" He then explains the self-concealing nature of childhood sexual abuse, noting that "[t]he memories and understanding of the effects of the trauma are, therefore, not otherwise fully understood, appreciated, or, in some instances, even remembered by the victim." Indeed, this Court has previously recognized the repressive symptoms that a victim of childhood sexual abuse may endure:

> Imagine being pricked on the arm with a pin. At first, such an intrusion would be disturbing, but with time might seem uneventful. Now imagine the pin carried a dreaded affliction, only discoverable after years of incubation. Such is often the nature of childhood sexual abuse. Many children only realize years later the true significance of the abuse they endured, especially in cases where the molestation occurred at the hands of family members or other trusted individuals. For some children, sexual violation is so traumatic it becomes psychologically self-concealing, if only to preserve sanity. For this reason, our Legislature enacted SDCL 26-10-25 creating a discovery rule for adult survivors of child sex abuse.

*Stratmeyer*, 1997 SD 97, ¶13, 567 NW2d at 222, 23. Sexual abuse at an early age prompts involuntary coping mechanisms which can prevent victims from making the causal connection between their past abuse and the psychological problems they experience as adults. *Id.* ¶19, 567 NW2d at 224. According to Dr. Snow, these combined circumstances made it "unrealistic for Ms. Sorace to comprehend or otherwise discover that she suffered from the condition I have diagnosed, as a result of the childhood sexual abuse, without counseling[.]"

[¶51.]     Nevertheless, the Court disregards Dr. Snow's 2006 diagnosis as "irrelevant," arguing that it merely represents the subsequent discovery of a "new injury." *Supra* ¶24. The Court reads Dr. Snow's affidavit too narrowly. Chronic Posttraumatic Stress Disorder is not a "new injury," but rather a specialized medical/psychological term encompassing and describing the symptoms that Sorace had previously exhibited, *i.e.*, anger management problems. These same problems, regardless of their name, have resonated in Sorace for many years and yet, until recently, Sorace was unable to make the connection between the abuse and her anger issues. Dr. Snow's affidavit explaining the self-concealing nature of childhood

sexual abuse provides a rational justification for Sorace's inability to bridge the gap and thus satisfies Sorace's burden.

[¶52.]	Additionally, in explaining the circumstances present in this case - the self-concealing nature of childhood sexual abuse, the emotional and psychological instability of the victim, and the fact that the abuse took place under the supervision and control of priests and other affiliates of the church - the affidavit at least implicitly suggests that it would have been unrealistic for anyone in Sorace's position to associate her anger problems with the acts of abuse.  As the Court acknowledges, such a showing may create a material issue of disputed fact.  *Supra* n3.  Here, Dr. Snow's affidavit raises a material issue as to whether Sorace's actions in not filing suit sooner were reasonable.  The circuit court's denial of summary judgment as to Sorace was appropriate.

[¶53.]	For these reasons, I respectfully dissent.